# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

**RATNA KANHAI, on behalf of herself and all others similarly situated,**

**Plaintiff,**

**-against-**

**KELLEY DRYE & WARREN LLP,**

**Defendant.**

Index No.: __________________

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

---

Plaintiff, Ratna Kanhai ("Plaintiff"), on behalf of herself and all others similarly situated, states as follows for her class action complaint against Defendant, Kelley Drye & Warren LLP, ("KDW" or "Defendant"):

## INTRODUCTION

1. In March 2025, KDW, a law firm, discovered it had lost control over its computer network and the highly sensitive personal information stored on its computer network in a data breach perpetrated by cybercriminals ("Data Breach"). Upon information and belief, the Data Breach has impacted several thousands of Defendant's current and former clients, employees, and others.

2. Following an internal investigation, Defendant learned cybercriminals had gained unauthorized access to the personally identifiable information ("PII") in its care, including but not limited to names, dates of birth, Social Security numbers, and driver's license numbers.

3. On or around May 27, 2025, over two months after discovering the breach, KDW finally began notifying Class Members about the Data Breach ("Breach Notice"). A sample Breach Notice is attached as Exhibit A.

4. Upon information and belief, cybercriminals were able to breach Defendant's

systems because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the PII of Plaintiff, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII—rendering it an easy target for cybercriminals.

5. Defendant's Breach Notice obfuscated the nature of the breach and the threat it posted—refusing to tell its current and former clients, employees and others how many people were impacted, how the breach happened, when it was discovered, or why Defendant delayed notifying victims that cybercriminals had gained access to their highly private information.

6. Defendant's failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

7. Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

8. In failing to adequately protect the PII in its care and obfuscating the nature of the breach, Defendant violated state law and harmed an unknown number of its current and former clients, employees, and others.

9. Plaintiff and the Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiff and members of the proposed Class trusted Defendant with their PII. But Defendant betrayed that trust. Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

10. Plaintiff is a former employee of Defendant's client and a Data Breach victim.

11. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before

the Data Breach, the private information of Plaintiff and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

12. Plaintiff Ratna Kanhai is a natural person and citizen of New York, where she intends to remain.

13. Defendant, Kelley Drye & Warren LLP, is a New York registered limited liability partnership with its principal place of business located at 3 World Trade Center, 175 Greenwich Street, New York, NY 10007.

## JURISDICTION & VENUE

14. This Court has subject matter jurisdiction over this action under N.Y. CPLR § 301.

15. This Court has personal jurisdiction over Defendant because it is headquartered in New York, regularly conducts business in New York, and has sufficient minimum contacts in New York.

16. Venue is proper in this Court because Defendant's principal office is in this County, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff' claims occurred in this County.

## FACTUAL ALLEGATIONS

***Kelley Drye & Warren LLP***

17. KDW touts that it is a "powerhouse firm" that concentrates on litigation, trials, government investigations and regulatory, trade, real estate, corporate, and bankruptcy matters.[1] It states that it employs over 300 attorneys and professionals in 8 locations.[2]

18. On information and belief, KDW accumulates highly private PII of its current and

---

[1] *About Us*, KDW, https://www.kelleydrye.com/about-us (last visited Aug. 8, 2025).
[2] *Id.*

former clients, employees, and others.

19. In collecting and maintaining PII, Defendant agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

20. KDW understood the need to protect the PII in its care and prioritize data security.

21. Indeed, KDW declares in its Privacy Policy[3] that:

a. "[KDW] respects your privacy and is committed to protecting your personal data;"

b. "we do not disclose, sell, share, rent, or exchange any personal data to or with unrelated third parties;"

c. "[t]o determine the appropriate retention period for personal data, we consider the amount, nature, and sensitivity of the personal data; the potential risk of harm from unauthorized use or disclosure of the personal data; the purposes for which we use the personal data and whether we can achieve those purposes through other means; and the applicable legal requirements;"

d. "[w]e have implemented and maintain appropriate physical, administrative, and technical measures designed to safeguard the data under our control against accidental or unlawful destruction, loss, alteration, unauthorized disclosure, unauthorized access, and other unlawful or unauthorized use."[4]

22. On information and belief, Defendant further promises to protect sensitive data in its internal privacy policies, and via its promises to follow state and federal law, including New York Rule of Professional Conduct 1.6. – Confidentiality of Information.

[3] Although KDW states that its employees and clients "may be subject to a separate privacy notice," on information and belief, such notice is substantially similar to the Privacy Policy posted on KDW's website.
[4] *Privacy Policy*, KDW, https://www.kelleydrye.com/privacy-policy (last visited Aug. 8, 2025).

23. Despite recognizing its duty to do so, on information and belief, KDW has not implemented reasonably cybersecurity safeguards or policies to protect the PII in its care or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to its clients,' employees' and others' PII.

***KDW's Data Breach***

24. Plaintiff is a former employee of KDW's client and a data breach victim.

25. Plaintiff (or her third-party agent) was required to provide her PII to Defendant as a condition of receiving legal services from Defendant. Plaintiff and Class members provided their PII to Defendant in exchange for Defendant's legal services.

26. Defendant used that PII to facilitate its business and required Plaintiff's former employer to provide Plaintiff's PII to obtain its services.

27. On information and belief, KDW collects and maintains the PII it collects unencrypted in its computer systems.

28. In collecting and maintaining that PII, Defendant implicitly agreed that it will safeguard the data using reasonable means according to state and federal law.

29. According to its Breach Notice, in late March 2025, Defendant "discovered unauthorized access to its network from an unknown third party."[5] Following an investigation, Defendant learned that an "unknown third party gained access to certain Kelley Drye internal systems and obtained a subset of data from those systems."[6]

30. In other words, Defendant's cyber and data security systems were completely inadequate in that it not only allowed cybercriminals to steal files containing a treasure trove of

[5] *Id.*
[6] *Id.*

thousands of its clients,' employees' and others' highly sensitive PII. Due to the obfuscating language in KDW's Breach Notice, it is unknown when the Data Breach began or how long cybercriminals had unfettered access to Plaintiff's and the Class's PII.

31. Through its inadequate security practices, Defendant exposed Plaintiff's and the Class's PII for theft and sale on the dark web.

32. Despite its duties to safeguard PII, Defendant did not in fact follow industry standard practices in securing the PII in its care, as evidenced by the Data Breach.

33. Defendant further states that it "recovered the data [stolen in the Data Breach] and [has] a high degree of confidence that the data will never be posted, disclosed, or used. In an abundance of caution, we continue to monitor the dark web for the data."[7] This statement indicates that KDW was the victim of a ransomware attack.

34. According to the United States Cybersecurity and Infrastructure Security Agency ("CISA"), ransomware is a form of malware designed to encrypt files on a device, rendering any files and the systems that rely on them unusable.[8] Thereafter, the cybercriminals demand a ransom payment in exchange for decryption, often threatening to sell or leak exfiltrated data if the ransom is not paid.[9]

35. KDW, while not expressly acknowledging it paid a ransom demand, states that it "recovered the data."[10]

36. However, even if Defendant made a ransom payment, there is no guarantee that the

---

[7] *Id.*
[8] *Ransomware 101*, CISA, https://www.cisa.gov/stopransomware/ransomware-101 (last visited August 5, 2025).
[9] *Id.*
[10] Ex. A.

PII stolen in the Data Breach will be deleted.[11] The stolen PII is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[12]

37. Thus, on information and belief, Plaintiff's and the Class's stolen Sensitive Information has already been published—or will be published imminently—by cybercriminals on the dark web.

38. And yet, on information and belief, Defendant waited until on or around May 2025 before it began notifying state Attorney's General about the Data Breach and until July 2025 before it notified victims that their PII had been stolen in the Data Breach.[13]

39. Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

40. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII in its care. And thus, Defendant caused widespread injury and monetary damages.

41. In response to the Data Breach, Defendant contends that it has "implemented additional security protocols designed to enhance the security of our network, internal systems and applications."[14] Although Defendant fails to expand on what these alleged "additional security protocols" are, such steps should have been in place before the Data Breach.

42. Defendant also recognized the actual imminent harm and injury that flowed from

[11] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.
[12] *Id.*
[13] Ex. A.
[14] *Id.*

the Data Breach, telling victims "we encourage you to remain vigilant of your information."[15]

43. KDW has offered complimentary credit monitoring services to victims[16], which does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves PII that cannot be changed, such as Social Security numbers.

44. Even with several months of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

45. Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

46. On information and belief, Defendant failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its clients,' employees' and others' PII. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII.

47. Additionally, KDW employs intentionally confusing language in its Breach Notice, claiming that a "unknown third party" "obtained" a "subset" of data from its systems and that it "recovered the data."[17]

48. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any

[15] *Id.*
[16] *See* id.
[17] *Id.*

degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts.

49. Despite Defendant's intentional opacity about the root cause of the Data Breach and its impact, several facts can be gleaned from the notice including that: (1) this data breach was the work of cybercriminals; (2) cybercriminals successfully infiltrated KDW's network environment; and (3) once inside, cybercriminals targeted highly private information for download and theft.

50. In the context of data breach notice letters of this type, Defendant's use of the phrases "unauthorized access" and "obtained a subset of data" are misleading. Organizations only send notice letters because data breach notification laws require them to do so, and notice letters are only sent to those persons who Defendant itself reasonably believes had sensitive PII such as Social Security numbers stolen by an unauthorized individual.

51. Therefore, upon information and belief, KDW's Breach Notice is intentionally misleading, and intentionally downplays the severity of the Data Breach and the threat it poses to thousands of individuals.

***The Data Breach was a Foreseeable Risk of Which Defendant was on Notice.***

52. It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

53. In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year.[18]

54. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

---

[18] *2024 Data Breach Report* at 6, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

55. Further, the American Bar Association warned the legal community that "law firms are prime targets" for data breaches, "with 29% experiencing a form of security breach, according to the 2023 ABA Cybersecurity TechReport."[19]

56. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

57. In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks, including ransomware attacks involving data theft, because warnings were readily available and accessible via the internet.

58. For example, in September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[20]

59. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web

[19] Clio, *Ensuring Security: Protecting Your Law Firm and Client Data*, AMERICAN BAR ASSOCIATION (May 9, 2024), https://www.americanbar.org/groups/law_practice/resources/law-technology-today/2024/ensuring-security-protecting-your-law-firm-and-client-data/.

[20] *Ransomware Guide*, U.S. CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Aug. 8, 2025).

portals, and (iv) ransomware tactics included threatening to release stolen data.

60. In light of the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted PII of thousands of its current and former clients, employees and others in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII and Defendant's type of business had cause to be particularly on guard against such an attack.

61. Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

62. Prior to the Data Breach, Defendant knew or should have known that it should have encrypted its clients,' employees' and others' Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Plaintiff's Experience and Injuries***

63. Plaintiff Ratna Kanhai is a former employee of one of Defendant's clients.

64. Thus, Defendant obtained and maintained Plaintiff's PII. As a result, Plaintiff was injured by Defendant's Data Breach.

65. Plaintiff is very careful in maintaining the security of her PII. To Plaintiff's knowledge, her PII has never been exposed in another data breach, other this the Data Beach at issue here.

66. Defendant solicited and Plaintiff provided Defendant with her PII. Defendant used that PII to facilitate its business.

67. Plaintiff, through her third-party agent, provided her PII to Defendant and trusted

the law firm would use reasonable measures to protect it according to Defendant's internal policies, state and federal law, and the New York Rules of Professional Conduct. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

68. Plaintiff and her third-party agent reasonably understood that Defendant would provide adequate cybersecurity and protection of PII.

69. Through its Data Breach, Defendant compromised at least Plaintiff's name, date of birth, Social Security number, and driver's license number.

70. Plaintiff received a Notice of Data Breach on or around July 2025.

71. In the aftermath of the Data Breach, Plaintiff has experienced a dramatic increase in scam and phishing texts and calls, especially texts that state she owes the state money for EZ pass fees and encouraging her to follow a link. On information and belief, Plaintiff's phone number was also compromised in the Data Breach.

72. Thus, information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

73. Accordingly, Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendant directed Plaintiff to take those steps in its Breach Notice.

74. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

75. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of

injuries that the law contemplates and addresses.

76. Plaintiff suffered actual injury from the exposure and theft of her PII and its threatened or actual publication on the dark web—which violates her rights to privacy.

77. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

78. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII in the hands of cybercriminals.

79. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

80. Today, Plaintiff has a continuing interest in ensuring that her PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

81. Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

82. As a result of Defendant's failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the class have suffered or are at an increased risk of suffering:

a. The loss of the opportunity to control how their PII is used;

b. The diminution in value of their PII;

c. The compromise and continuing publication of their PII;

d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f. Delay in receipt of tax refund monies;

g. Unauthorized use of stolen PII; and

h. The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

83. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

84. The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

85. Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

86. It can take victims years to spot identity or PII theft, giving criminals plenty of time to use that information for cash.

87. One such example of criminals using PII for profit is the development of "Fullz" packages.

88. Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

89. The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and members of the Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

90. Defendant disclosed the PII of Plaintiff and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiff and the Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all

using the stolen PII.

91. Defendant's failure to properly notify Plaintiff and the Class of the Data Breach exacerbated Plaintiff's and the Class's injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant failed to adhere to FTC guidelines.***

92. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

93. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business. The guidelines explain that businesses should:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

94. The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

95. The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security

measures.

96. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

97. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII in its care constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

98. Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

99. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

100. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both

the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

101. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

102. Plaintiff brings this class action under N.Y. CPLR § 901, *et seq.*, individually and on behalf of all members of the following class:

> **All individuals residing in the United States whose PII was compromised in Defendant's Data Breach, including all those who received notice of the breach.**

103. Excluded from the Class is Defendant, their agents, affiliates, parents, subsidiaries, any entity in which Defendant have a controlling interest, any of Defendant's officers or directors, any successors, and any Judge who adjudicates this case, including their staff and immediate family.

104. Plaintiff reserves the right to amend the class definition.

a. **Numerosity**. Plaintiff is representative of the Class, consisting of several thousand members, far too many to join in a single action;

b. **Ascertainability**. Members of the Class are readily identifiable from information in Defendant's possession, custody, and control;

c. **Typicality**. Plaintiff's claims are typical of class claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

d. **Adequacy**. Plaintiff will fairly and adequately protect the proposed Class's interests. Her interests do not conflict with the Class's interests, and she has retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

e. **Commonality**. Plaintiff's and the Class's claims raise predominantly common fact and legal questions that a class wide proceeding can answer for the Class. Indeed, it will be necessary to answer the following questions:

i. Whether Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

ii. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

iii. Whether Defendant were negligent in maintaining, protecting, and securing PII;

iv. Whether Defendant breached contract promises to safeguard Plaintiff's and the Class's PII;

v. Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

vi. Whether Defendant's Breach Notice was reasonable;

vii. Whether the Data Breach caused Plaintiff's and the Class's injuries;

viii. What the proper damages measure is; and

ix. Whether Plaintiff and the Class are entitled to damages, treble damages, or injunctive relief.

105. Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

**FIRST CLAIM FOR RELIEF**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

106. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

107. Plaintiff and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

108. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

109. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

110. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class Members' PII.

111. Defendant owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect

the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

112. Also, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

113. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

114. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

115. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

116. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

117. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

118. Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

119. Defendant breached these duties as evidenced by the Data Breach.

120. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff and Class Members' PII by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

121. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

122. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

123. Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

124. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary

damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

125. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CLAIM FOR RELIEF**
**Negligence *per se***
**(On Behalf of Plaintiff and the Class)**

126. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

127. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class Members' PII.

128. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive PII.

129. Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

130. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as

described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

131. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

132. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

133. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

134. Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

135. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CLAIM FOR RELIEF**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

136. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

137. Defendant offered legal services to Plaintiff and members of the Class if, as a condition of providing legal services, Plaintiff and members of the Class (or their third-party agent_ provided Defendant with their PII.

138. In turn, Defendant agreed it would not disclose the PII it collects to unauthorized persons. Defendant also promised to safeguard its clients,' its employees' and others' PII.

139. Plaintiff and the members of the Class (or their third-party agent) accepted Defendant's offer by providing PII to Defendant in exchange for legal services with Defendant.

140. Implicit in the parties' agreement was that Defendant would provide Plaintiff and members of the Class with prompt and adequate notice of all unauthorized access and/or theft of their PII.

141. Plaintiff and Class members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law, the New York Rules of Professional Conduct and its internal policies.

142. Plaintiff and the members of the Class (or their third-party agent) would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

143. Defendant materially breached the contracts it had entered with Plaintiff and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiff and members of the Class by:

a. Failing to properly safeguard and protect Plaintiff's and members of the Class's PII;

b. Failing to comply with industry standards, including the New York Rules of Professional Conduct, as well as other legal obligations that are necessarily incorporated into the parties' agreement; and

c. Failing to ensure the confidentiality and integrity of electronic PII that Defendant

created, received, maintained, and transmitted.

144. The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

145. Plaintiff and members of the Class have performed under the relevant agreements, or such performance was waived by the conduct of Defendant.

146. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

147. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

148. Defendant failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

149. In these and other ways, Defendant violated its duty of good faith and fair dealing.

150. Plaintiff and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

151. Plaintiff, on behalf of herself and the Class, seeks compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for

identity theft and fraud, plus prejudgment interest, and costs.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of the Plaintiff and the Class)**

152. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

153. This claim is plead in the alternative to the breach of implied contractual duty claim.

154. Plaintiff and members of the Class (or their third-party agent) conferred a benefit upon Defendant in the form of monetary payment. Defendant also benefited from the receipt of Plaintiff's and the Class's PII, as this was used to facilitate legal services.

155. Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiff and members of the Class.

156. Under principals of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and the proposed Class's services and their PII because Defendant failed to adequately protect their PII. Plaintiff and the proposed Class (or their third-party agent) would not have provided their PII or done business with Defendant at the payrates they did had they known Defendant would not adequately protect their PII.

157. Defendant should be compelled to disgorge into a common fund to benefit Plaintiff and members of the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged here.

**FIFTH CLAIM FOR RELIEF**
**Invasion of Privacy**
**(On Behalf of the Plaintiff and the Class)**

158. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

159. Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

160. Defendant owed a duty to its clients, employees and others, including Plaintiff and the Class, to keep this information confidential.

161. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff's and Class Members' PII is highly offensive to a reasonable person.

162. The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class (or their third-party agent) disclosed their sensitive and confidential information to Defendant, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

163. The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

164. Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

165. Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

166. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

167. As a proximate result of Defendant's acts and omissions, the PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

168. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class because their PII are still maintained by Defendant with its inadequate cybersecurity system and policies.

169. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiff and the Class.

170. In addition to injunctive relief, Plaintiff, on behalf of herself and the other members of the Class, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**SIXTH CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(On Behalf of the Plaintiff and the Class)**

171. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

172. Given the relationship between Defendant and Plaintiff and Class members, where Defendant became guardian of Plaintiff's and Class members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff's and Class members' PII; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

173. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

174. Because of the highly sensitive nature of the PII, Plaintiff and Class members would

not have entrusted Defendant, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices.

175. Defendant breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII.

176. Defendant also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

177. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**PRAYER FOR RELIEF**

Plaintiff and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

D. Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen PII;

E. Awarding Plaintiff and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J. Granting such other or further relief as may be appropriate under the circumstances.

**JURY DEMAND**

Plaintiff hereby demands that this matter be tried before a jury.

Dated: August 12, 2025

Respectfully submitted,

By: /s/ Linda H. Joseph
Linda H. Joseph, Esq.
Schroder, Joseph & Associates, LLP
394 Franklin Street; Second Floor
Buffalo, New York 14202
Telephone: (716) 881-4902
Facsimile: (716) 881-4909
Email: ljoseph@sjalegal.com

Raina Borrelli (*Pro Hac Vice* forthcoming)
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

*Attorneys for Plaintiff and Proposed Class*

# *Exhibit A*

Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007

Tel: (212) 808-7889
Fax: (212) 808-7897

<Date>

**Via U.S. Mail**

[FIRST NAME] [LAST NAME]
[ADDRESS]
[CITY], [STATE] [ZIP]

**Re: Notice of Data Security Incident**

Dear [First Name] [Last Name],

We are writing to inform you that Kelley Drye & Warren LLP ("Kelley Drye") experienced a cybersecurity incident that involved some of your personal information. This notice explains the incident, steps we have taken in response, and additional information on steps you may take to help protect your information.

***What Happened***

In late March 2025, Kelley Drye discovered unauthorized access to its network from an unknown third party. Once we detected the incident, our team immediately initiated our incident response plan and engaged Norton Rose Fulbright to lead an investigation and engage leading third-party forensic experts to investigate and contain the incident. Kelley Drye also notified law enforcement of the incident.

The investigation confirmed that the unknown third party gained access to certain Kelley Drye internal systems and obtained a subset of data from those systems. A thorough review of the affected data was conducted to identify what information was involved and to identify individuals to whom the data related.

We have recovered the data and have a high degree of confidence that the data will never be posted, disclosed, or used. In an abundance of caution, we continue to monitor the dark web for the data.

***What Information Was Involved***

The review determined that the data involved contained some of your personal information, including your name, and one or more of the following: [INSERT].

***What We Are Doing***

To help prevent a similar type of incident from occurring in the future, we implemented additional security protocols designed to enhance the security of our network, internal systems and applications. Kelley Drye will also continue to evaluate additional steps that may be taken to further increase our defenses. In addition, we are continuing to cooperate with law enforcement's.

***What You Can Do***

While we are not aware of any evidence that your personal information has been misused, we wanted to make you aware of the incident and provide you with additional information on steps you may consider taking. We encourage you to remain vigilant of your information and, as a precaution, **Kelley Drye is offering you complimentary access to Experian credit monitoring for 24 months**. This product helps detect possible misuse of your personal information and provides you with identity protection services focused on immediate identification and resolution of identity theft. This complimentary access is completely free for 24 months and enrolling in this program will not hurt your credit score.

For more information on Experian, including instructions on how to activate your complimentary 24-month membership, as well as additional steps you may take to help protect your information, please see the additional information provided in the following pages.

***For More Information***

Kelley Drye takes the security of your personal information seriously. If you have questions about the incident, please contact our cyber response counsel, Norton Rose Fulbright (KDW_questions@nortonrosefulbright.com). For more information about credit monitoring, please call [insert call center phone number], Monday through Friday, between 9:00 a.m. and 9:00 p.m. Eastern Time. If you have a speech or hearing impairment and use a TTY, call 711.

Sincerely,

Kelley Drye & Warren LLP

**Experian Enrollment Information**

To help protect your identity, we are offering a complimentary two-year membership of Experian's® IdentityWorksSM. This product provides you with superior identity detection and resolution of identity theft. To activate your membership and start monitoring your personal information please follow the steps below:

- Ensure that you enroll by: [**DATE**] (Your code will not work after this date.)
- Visit the Experian IdentityWorks website to enroll: [**URL**]
- Provide your activation code: [**XXXXX**]

If you have questions about the product, need assistance with identity restoration or would like an alternative to enrolling in Experian IdentityWorks online, please contact Experian's customer care team at [**EXPERIAN CONTACT NUMBER**] by [**ENROLLMENT END DATE**]. Be prepared to provide engagement number [**XXXX**] as proof of eligibility for the identity restoration services by Experian.

**ADDITIONAL DETAILS REGARDING YOUR 24-MONTH EXPERIAN IDENTITYWORKS MEMBERSHIP:**

A credit card is not required for enrollment in Experian IdentityWorks.

You can contact Experian immediately regarding any fraud issues, and have access to the following features once you enroll in Experian IdentityWorks:

- **Experian credit report at signup**: See what information is associated with your credit file. Daily credit reports are available for online members only.*
- **Credit Monitoring**: Actively monitors Experian files for indicators of fraud.
- **Identity Restoration**: Identity Restoration specialists are immediately available to help you address credit and non-credit related fraud.
- **Experian IdentityWorks ExtendCARE™**: You receive the same high-level of Identity Restoration support even after your Experian IdentityWorks membership has expired.
- **Up to $1 Million Identity Theft Insurance****: Provides coverage for certain costs and unauthorized electronic fund transfers.

If you believe there was fraudulent use of your information and would like to discuss how you may be able to resolve those issues, please reach out to an Experian agent at (855) 414-6050. If, after discussing your situation with an agent, it is determined that Identity Restoration support is needed, then an Experian Identity Restoration agent is available to work with you to investigate and resolve each incident of fraud that occurred (including, as appropriate, helping you with contacting credit grantors to dispute charges and close accounts; assisting you in placing a freeze on your credit file with the three major credit bureaus; and assisting you with contacting government agencies to help restore your identity to its proper condition).

Please note that this Identity Restoration support is available to you for two years from the date of this letter and does not require any action on your part at this time. The Terms and Conditions for this offer are located at www.ExperianIDWorks.com/restoration. You will also find self-help tips and information about identity protection at this site.

* Offline members will be eligible to call for additional reports quarterly after enrolling.

** The Identity Theft Insurance is underwritten and administered by American Bankers Insurance Company of Florida, an Assurant company. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.

## Information About Identity Theft Protection Guide

**Contact information for the three nationwide credit reporting companies is as follows**:

| Equifax | Experian | TransUnion |
|---|---|---|
| Phone: 1-800-685-1111<br>P.O. Box 740256<br>Atlanta, Georgia 30348<br>www.equifax.com | Phone: 1-888-397-3742<br>P.O. Box 9554<br>Allen, Texas 75013<br>www.experian.com | Phone: 1-888-909-8872<br>P.O. Box 105281<br>Atlanta, GA 30348-5281<br>www.transunion.com |

**Free Credit Report.** We remind you to be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity. If you identify any unauthorized charges on your financial account statements, you should immediately report any such charges to your financial institution. You may obtain a copy of your credit report, free of charge, once every 12 months from each of the three nationwide credit reporting companies. To order your annual free credit report, please visit www.annualcreditreport.com or call toll free at 1-877-322-8228. You can also order your annual free credit report by mailing a completed Annual Credit Report Request Form (available from the U.S. Federal Trade Commission's ("FTC") website at www.consumer.ftc.gov) to: Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA 30348-5281.

**For Colorado, Georgia, Maine, Maryland, Massachusetts, New Jersey, Puerto Rico, and Vermont residents:** You may obtain one or more (depending on the state) additional copies of your credit report, free of charge. You must contact each of the credit reporting agencies directly to obtain such additional report(s).

**Security Freeze.** Security freezes, also known as credit freezes, restrict access to your credit file, making it harder for identity thieves to open new accounts in your name. You can freeze and unfreeze your credit file for free. You also can get a free freeze for your children who are under 16. And if you are someone's guardian, conservator or have a valid power of attorney, you can get a free freeze for that person, too.

How will these freezes work? Contact all three of the nationwide credit reporting agencies – Equifax, Experian, and TransUnion. If you request a freeze online or by phone, the agency must place the freeze within one business day. If you request a lift of the freeze, the agency must lift it within one hour. If you make your request by mail, the agency must place or lift the freeze within three business days after it gets your request. You also can lift the freeze temporarily without a fee.

The following information must be included when requesting a security freeze (note that if you are requesting a credit report for your spouse, this information must be provided for him/her as well): (1) full name, with middle initial and any suffixes; (2) Social Security number; (3) date of birth; (4) current address and any previous addresses for the past five years; and (5) any applicable incident report or complaint with a law enforcement agency or the Registry of Motor Vehicles. The request must also include a copy of a government-issued identification card and a copy of a recent utility bill or bank or insurance statement.
It is essential that each copy be legible, display your name and current mailing address, and the date of issue.

**For New Mexico residents:** You may obtain a security freeze on your credit report to protect your privacy and ensure that credit is not granted in your name without your knowledge. You may submit a declaration of removal to remove information placed in your credit report as a result of being a victim of identity theft. You have a right to place a security freeze on your credit report or submit a declaration of removal pursuant to the Fair Credit Reporting and Identity Security Act. For more information, including information about additional rights, go to www.consumerfinance.gov/learnmore or write to: Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC 20552.

**Fraud Alerts.** A fraud alert tells businesses that check your credit that they should check with you before opening a new account. An initial fraud alert stays on your credit report for one year. You may have an extended alert placed on your credit report if you have already been a victim of identity theft with the appropriate documentary proof. An extended fraud alert stays on your credit report for seven years. To place a fraud alert on your credit reports, contact one of the nationwide credit bureaus. A fraud alert is free. The credit bureau you contact must tell the other two, and all three will place an alert on their versions of your report.

**Federal Trade Commission and State Attorneys General Offices**. If you believe you are the victim of identity theft or have reason to believe your personal information has been misused, you should immediately contact the Federal Trade Commission and/or the Attorney General's office in your home state. You may also contact these agencies for information on how to prevent or avoid identity theft. You may contact the Federal Trade Commission, Consumer Response Center, 600 Pennsylvania Avenue, NW, Washington, DC 20580, www.ftc.gov/bcp/edu/microsites/idtheft/, 1-877-IDTHEFT (438-4338).

**For Connecticut Residents:** You may contact and obtain information from your state attorney general at: Connecticut Attorney General's Office, 55 Elm Street, Hartford, CT 06106, 1-860-808- 5318, www.ct.gov/ag

**For District of Columbia Residents:** You may contact the Office of the Attorney General for the District of Columbia, 441 4th Street NW, Suite 1100 South, Washington, D.C. 20001, https://oag.dc.gov, 202-442-9828.

**For Maryland Residents:** You may contact the Maryland Office of the Attorney General, Consumer Protection Division, 200 St. Paul Place, Baltimore, MD 21202, https://www.marylandattorneygeneral.gov/, 1-888-743- 0023**.**

**For New York Residents:** You may contact the New York Department of State Division of Consumer Protection, One Commerce Plaza, 99 Washington Ave., Albany, NY 12231-0001, 518-474-8583 / 1- 800-697-1220, http://www.dos.ny.gov/consumerprotection; and New York State Office of the Attorney General, The Capitol, Albany, NY 12224-0341, 1-800-771-7755, https://ag.ny.gov.

**For North Carolina residents**: You may contact the North Carolina Office of the Attorney General, Consumer Protection Division, 9001 Mail Service Center, Raleigh, NC 27699-9001, www.ncdoj.gov, 1-877-566-7226.

**For Texas residents:** You may contact and obtain information from your state attorney general at: Office of the Texas Attorney General www.texasattorneygeneral.gov/consumer-protection/identity-theft or contact the Identity Theft Hotline at 800-621-0508 (toll-free)

**Reporting of identity theft and obtaining a police report.**
You have the right to obtain any police report filed in the United States in regard to this incident. If you are the victim of fraud or identity theft, you also have the right to file a police report.

**For Iowa residents:** You are advised to report any suspected identity theft to law enforcement or to the Iowa Attorney General.

**For Massachusetts residents:** You have the right to obtain a police report if you are a victim of identity theft. You also have a right to file a police report and obtain a copy of it.

**For Oregon residents:** You are advised to report any suspected identity theft to law enforcement, the Federal Trade Commission, and the Oregon Attorney General.